Good morning, I'm Bob Peterson representing Williams Construction. This is an appeal from a number of citations that were issued to the employer as a result of a death of an employee in a trench during a construction project at an Indian reservation in Southern California. I guess the concern that Williams Installation has is citations are a significant fact. They affect the company's ability to continue to do business. All those citations are on the Internet. When you're pre-bidding jobs, pre-bid qualifications require you to explain things. There are civil actions, there are work comp actions that describe the work that's being done. Administrative attorneys in the state are now looking at employers when they have serious violations in terms of the possibility of criminal prosecution. And, of course, the Contractor's State License Board has statutes that provide that a license can be suspended or revoked in the event of a serious violation of this nature. So the matter is significant to Williams Construction. And, of course, from our standpoint, this is really the first layer of review. We had an administrative hearing before an administrative law judge, issued some findings of fact, et cetera. We've asked for a petition. We filed a petition to have the matter reconsidered by the review commission. They denied that. And so now we sit here. So this is really the first time we've had a chance to address the findings of fact of the particular judge. Now, the standard counsel of our review is substantial evidence. Is that correct? That's correct. And I understand the substantial evidence test, believe me. But the fact of the matter is we don't believe that in this case there is substantial evidence. Now, I realize what the judge said. I was there. And I read his decision. I read that as well. I've heard the evidence, as I'm sure you've read it. I guess the problem is the judge, in my opinion, made some significant errors. And while I realize the substantial evidence test controls this kind of a review, there has to be evidence to support the substantial evidence test. And in this case, when you look at the evidence, there seem to be a number of things that we found wrong with it, not the least of which is the finding that the particular judge found Mr. Palomar, the injured employee, to be a credible witness. Now, Mr. Palomar, when you review the transcript of the testimony, which, of course, we've addressed in our reply brief, what had happened is the morning of the 19th, September 19th, of course, we had this tragic accident. The trench walls collapsed. We had an employee killed. Mr. Palomar was injured. So you say to Mr. Palomar, why were you in the trench that morning? You weren't supposed to be in the trench that morning. Why not? Because we were excavating and backfilling the trench. In other words, we're putting pipe in the ground. You dig an excavation. You dump the pipe in. You just keep excavating as you're going. And then you're backfilling as you're going. Everybody realized that that morning we were going to have heavy construction equipment excavating the east end of the excavation, backfilling the west end. When I asked Mr. Palomar about that on cross-examination, Mr. Palomar was inconsistent. I don't know why. I don't think he had any reason to misstate things, although we do have enormous civil consequences. So what was Mr. Palomar's evidence essential for? I'm sorry? What was his evidence essential for? I mean, for example, the issue with regard to egress from the trench as to whether there was 25 feet or 40 feet or whatever, that had nothing to do with him, right? In other words, the facts are undisputed as to what was available to get out of the ditch. The facts are not disputed as to the length of the trench, how he entered the trench that morning, Your Honor, as you've indicated. How he entered the trench, the fact that there was no ladder, the fact that the trench was more than 25 feet wide. Well, I'm not quite sure how wide it was, but we know it was approximately 40 feet long. I mean long is what I mean. I'm sorry. And that he had entered it from the west end using a ramp, according to his testimony. All right, but does it matter where – my understanding is it doesn't make any difference where he was. What makes a difference is that you had a trench that was more than 40 feet long and only had an egress on one side. I think, Your Honor, that when the regulations, at least in terms of that ramp issue, when the regulation requires a number of things you can have. You can have a ladder, you can have a ramp, you can have any effective safety. But within 25 feet.  There wasn't one. Your Honor, I think that what you – when the record is reviewed, what's established is we were excavating on the east end of that trench. In other words, we had a big bucket in there digging dirt, putting it off to the side and so forth and so on. We know that Mr. Palomar was not more than 25 feet away from the ramp because, again, the fact the trench is 40 feet long. Okay. What I'm asking you is why does that matter? The fact is that he – there was a trench. He could have walked the length of it and he could have gotten – and he could have been more than 25 feet away. Isn't that sufficient for the violation? I don't think so, Your Honor. I think that as long – I think when you read the regulation, this comes up all the time. You could have a – you can have a trench 50 feet long, and as long as you had access to it at both ends, you're within 25 feet of the ends. In this case, I think our position is if you get – Oh, yeah, that's right. If you had access at both ends. But here my understanding is you didn't. You only had access at one end. That's correct, Your Honor. There was only access at one end. That's right. There would have been no reason – well, in fact, they did not go to the east end of that excavation. They were always within 25 feet of the ramp that existed, which he himself had used that morning to get into the trench. So I think the regulation is as long as you're within 25 feet of whatever it is, be it a ramp or a ladder or whatever, that that's sufficient to comply with the regulation. And the evidence, at least in that regard, seems to be pretty undisputed that they were within 25 feet of the ramp. Now – But that's a legal question, right? I mean, it's a legal question as to whether or not you have to have access at both ends because it's 40 feet long or whether it only matters where the person is. That's just a legal question. And what Mr. Palomar says about it or doesn't say about it doesn't matter. I suppose to some degree it's a legal question. I think it's also a factual question. I think if you're within 25 feet of whatever it is, the problem is the judge in this case just simply wanted a ladder. He didn't even address the ramp issue. And the regulation requires you or allows you to use a ramp. In other words, when you're going into an excavation, you don't have to have a ladder. As long as you have access in and out of that excavation, it doesn't have to be a ladder. The judge didn't even address the issue of the existence of the ramp. Now, standing to fact, the facts establish that Mr. Palomar was within 25 feet of the ramp. Therefore, there couldn't have been a violation of that particular subsection. But I think that Mr. Palomar's comments were critical. When I asked Mr. Palomar about the work that morning and the day before, he said, look, he said, when we left the day before, the trench had collapsed. It was never redone. That's the way it was when we left on the 18th. The trench had collapsed. It was too late in the day, so nobody did anything about it. Well, you know that's not the case. I mean, everybody concedes the fact that there was not a problem on the 19th, the morning of the 19th. All we're doing simply there is going to extend the excavation for the trench, backfill the one end, dig on the east end, backfill the west end. So we know that Mr. Palomar either didn't have it straight or whatever. But he was not a credible witness. Yet I believe that the judge, again, you get into this substantial evidence test, and the question is, well, who's credible and who isn't? And the only witness that really was not entirely credible was Mr. Palomar. And yet, obviously, Judge Barkley relied considerably upon Mr. Palomar's testimony, perhaps understandably, but it has to be credible. When somebody says to you, now the trench was collapsed the morning of the 19th and you know that wasn't the case, well, then you have some questions about credibility. But I think also that one of these citations dealt with a lack of training. And so you go into these hearings and you prepare to defend the hearings based on what you're charged with. In this case, we're charged with two fellows not having been trained. One, of course, was Mr. Palomar, been working for nine months with the employer. And all of the ‑‑ Excuse me, but why do you think that's what you were charged with? I'm sorry? Why do you think that that's what the charge was? Well, that was citation one, item one, a failure to instruct the employees on trench safety. But did it say who? Did it say who, the charge? Well, when we got to the hearing, when the judge, I think I floated that either in our opening brief or our reply brief, asked the Ocean attorney specifically who had not been trained, it was Mr. Palomar and the deceased worker. That was the answer. So then as a defense lawyer, you say, okay, what I have to do now is present evidence as to why these fellows were trained. Well, the deceased employee, nobody knows. So that wasn't the issue. So the question was Mr. Palomar. Now, Mr. Palomar, like I say, had been working for Williams for nine months. And that's what they do. They dig trenches and they put pipe in and they fill the trenches and they just do it day after day. There's nothing unusual about this operation. All the other employees that testified said we talk about safety every day. So then what happens in the decision is the administrative law judge talks about another employee, Mr. Goforth, who wasn't trained, allegedly wasn't trained. Well, that's the first time we hear of it is when we read the decision that now the judge has taken someone else out of context and brought him and said, well, you didn't train them. We can defend against that at the hearing because the OSHA lawyer said specifically it was a deceased employee and Mr. Palomar. I mean, that's the kind of situation you get into. So you look at those kind of things out of the administrative law judge and you say, you know, that just doesn't make any sense. How did that come at us? Where did that come from? And so I think that when we talk about substantial evidence, that's the kind of thing we're talking about. Well, do we have credibility? Can we rely on? Who can we rely on in terms of these people? Well, it's clear that the lesson on safety, if given, wasn't heeded. Is that correct? So there's kind of an implication that they weren't properly trained. Nobody should have gone down there without shoring or some type of. Judge Fletcher, I agree with you. That's very true. No question about that. I mean, and that's, you know, I've been doing this for 30 years. I mean, I see that all the time. You train and you train and you train and people do things that are unpredictable. I don't know. I mean, you can't predict everybody's actions. I don't think there was any management representative there that morning. There's certainly no testimony. The management representative was aware these two fellows were going to be in the trench that morning because they remember exactly what they were going to do was they were going to have heavy equipment working at both ends of that excavation. And so they were going to be excavating the east end, backfilling the west end. The pipe was already in the west end. So there was no reason for anyone to be in that trench that morning. And I think that's what caught everybody by surprise. Why did you? Well, Mr. Palomar understood that it was his job to clean the pumps, right? He kept saying, why were you there? Because that's my job. The pump wasn't working and I'm supposed to clean it. And that was not foreseeable that he was going to think that he's supposed to clean the pump because that was his job to clean the pump? No, Your Honor. I don't think it was foreseeable. Not in those situations. Not when everybody understands at the end of the day on the 18th, I guess it was, that in fact what we're going to be doing tomorrow morning is we're going to be digging and backfilling. No one would go in the trench in that kind of a situation because they're both big pieces of equipment that are operating in the trench. Well, aside for the moment, as I understand it, there was a finding that Zamba and J.P. Williams didn't know the OSHA requirements for trenching or didn't know the OSHA regulations in general in terms of them. So if they didn't know them, they couldn't have trained people in them, and why isn't that sufficient? One of the things they're supposed to train people in is regulations. They don't know the regulations. Well, I think one of the things you're trained on, Your Honor, are, you know, just normal common sense kind of things. Well, no, that's not what the rule says. I mean, you may have a problem with the rule, but the rule says, as I understand it, that they're supposed to instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment. Well, they couldn't have done that because they didn't know the regulations applicable to the work environment. Well, what the evidence established, Your Honor, we had three employees out there with 55 years of experience in underground construction. They're the ones who were running the job site. Now, all of the witnesses, except Mr. Palomar, of course, testified. Now, we talked about safety every single day at the beginning of all the shifts, all the time. And so I can tell you right now that the regulations, as I say, I've been doing this a long time, are very specific. You don't cross every T and dot every I when you're talking to construction workers. It's about what's safe and not safe. You use common sense. It's exactly what J.P. said. You should go out there. We've been doing this a long time. There's never any change in the procedure. This is exactly how we do it. We've been doing it for months before. We're going to do it for months afterwards. Nothing changes. And don't go in a trench when we've got big, heavy construction equipment in the trench. Now, I don't think it would be fair to attribute some kind of knowledge or lack of instruction by any of these individuals that were running that job site. Listen, these are not the most sophisticated people in the world. I mean, and I don't mean that to be in a demeaning way. I'm not saying it for that reason. It's just that these are people that put in this kind of equipment, and they've been doing it, as I said, 55 years of experience was out there with these particular individuals. That's a lot of experience. They knew what they were doing. They've had a great safety record up until now. Counsel, it's odd that the pumps were still down there. They removed the shoring. That's correct, Your Honor. Yes. And yet they left the pumps in that location. As an employee whose obligation is to clean the pumps, you would think that he would be justified in thinking he had to go down there and do that. No question about that. I would have thought that they would have removed those pumps as well. The fact of the matter is, for whatever reason, they hadn't. But I think the evidence is clear that they were going to be excavating the east end and backfilling the west end that morning. Those pumps did not need to be there at that point in time. I may not be understanding the configuration, but if I am, somebody had to do something with those pumps because they had to be removed if they were going to backfill. Is that not right? That's correct. You'd pull them out. So somebody had to go down there and do something to the pumps. Well, actually, you'd just pull them out from ground level. You wouldn't walk down there and pull out the pumps. I see. You could have gone down there. I see. You'd just pull them out. I see. I've got four minutes left, so I'd like to hold that four minutes. Thank you very much. If anything else strikes me. Good. Thank you.  My name is Joanna Hull on behalf of Respondent Secretary of Labor. In the words of one Williams employee, this trench was a bad situation. It was 10 to 12 feet deep and rose vertically from the bottom for five feet before it sloped back at a 45-degree angle. The trench was at least 40 to 45 feet long, and water seeped into it almost constantly from a nearby river. And on the morning of September 19, 2002, there was no shoring in the trench or any type of cave-in protection whatsoever. That morning, two Williams employees, Jose Aguinega and Aiden Palomar, entered the trench to clean the water pumps inside, as was their usual practice. While they were inside, the trench collapsed, killing Aguinega and severely injuring Palomar. OSHA investigated and issued five citations, four of which are at issue here on appeal. Substantial evidence supports the commission's finding that Williams violated all four standards. Williams' primary defense was that they didn't know the employees would enter the trench that morning to clean the water pumps. Substantial evidence supports that Williams did, in fact, know that these employees would clean the trench. Thus, the ALJ correctly affirmed a citation for failure to provide cave-in protection. Williams had actual knowledge that the employees were in the trench through Zamba, who acted as a supervisor on the site. Palomar testified that when he was in the trench, he could see Zamba, and Zamba could also see him. Zamba also testified that when he was on the east end of the trench, in the excavator, he had an unobstructed view forward while digging down the trench. JP corroborated that testimony. While Zamba did change his testimony at the hearing, stating that he only saw the employees in the split second before the accident occurred, this contradicted the statement he gave right after the accident, that he saw the employees in the trench. The ALJ properly credited that prior statement because he determined that Zamba's testimony at the hearing appeared rehearsed and was implausible. This credibility determination cannot be overturned unless it is patently unsupportable. There is nothing in the record that undercuts this determination. What is about this, does Palomar's credibility matter, and if it does, is it so that, was there ever any finding about his story that there had been a collapse the day before? Does that matter? We believe that Palomar's testimony about the collapse on the 18th is irrelevant. Palomar's credibility is in play to the extent that he said it was his usual practice to clean the pumps, and he entered the trench to do so that morning. But that was corroborated by a number of individuals, including Lopez, and his testimony in every other respect was consistent. There may have been some translation difficulty about the collapse on the 18th, but that's irrelevant for the purposes that we're considering here. Also, I'd like to just point out that Williams raises that for the first time in their reply brief here, so their argument about Palomar's testimony on the 18th should be waived because it was never raised in the opening brief. That also goes to their argument about the ALJ's bias, again, raised for the first time in their reply brief. Zamba's knowledge was properly imputed to Williams because Zamba acted as a manager on the site. Both Lopez and Goforth testified that they received their work instructions from Zamba and that they would go to him if they had safety concerns. While Williams tried to contend that J.P. was the supervisor on the site, Lopez said that he thought J.P. was just a member of the crew, and Palomar didn't know what J.P.'s job was. Under these circumstances, it was permissible to impute Zamba's knowledge that the employees were in the trench to Williams. Even if actual knowledge had not been established, which we believe it clearly is by the record, the ALJ also properly determined that Williams had constructive knowledge that the employees were in the trench because Williams failed to exercise reasonable diligence to keep the employees out. Reasonable diligence requires adequate supervision of employees and adequate training programs and work rules to ensure that the work is safe. Williams had none of those. Reasonable diligence would include adequate supervision of the six employees on this work crew, but there was no evidence that Williams did anything to keep the employees out of the trench on the morning of the 19th. There was no warning tape, no barrier around the trench, and no instructions not to enter the unsured trench that morning. All of this compels that Williams violated the requirement to protect employees from cave-ins in this trench. What about this 25-foot argument that the ALJ focused on the latter, but in fact they were within 25 feet? That would be the violation of failure to provide a safe means of egress. Again, Williams's primary defense was that they didn't know the employees would enter the trench. For the same reasons that I've just explained, Williams could expect that the employees were in the trench and therefore did have to provide a safe means of egress within 25 feet. The evidence established that the trench was at least 40 to 45 feet long and had only one means of entry and exit at the western end, the ramp. Now, the ALJ did reverse the trench directions. He said that the ramp was at the eastern end, but that's inconsequential. The important point is that there was only one entry and exit point in the trench at least 40 to 45 feet long, and Williams did not restrict the employees' access to that trench in any way. This access alone establishes the violation. And where, in fact, was the decedent when the accident occurred? Was he within 25 feet? No. The evidence shows that the workers were at the eastern end of the trench at the time the collapse occurred. The ramp was at the western end. If you look at the photographs, R1 and R2, and the testimony at transcript, page 296, that describes where the accident occurred, and it was at the eastern end of the trench closest to the excavator. Williams's argument that because the employees were 25 feet from the excavator, they had to be 25 feet from the eastern end of the trench is erroneous because the excavator wasn't at the end of the trench. It was at least 15 feet back. There was testimony that Zamba moved the excavator forward after the accident to try and help rescue the employees. So it actually, the evidence establishes that the employees were about 10 feet from the eastern end of the trench, far more than 25 feet from the western ramp. Does that ultimately matter? And what is the legal authority for the position that it doesn't matter? Right. We believe that employee access alone establishes the violation. Under the OSH Act, to establish a serious violation, you need to establish that the standard applies, the employer violated the standard, that employees had access, and that the employer knew. So all you need to do is establish that employees had access to the violative condition. Here, because the employees entered the trench and weren't restricted in their travel within that trench, the access is established and therefore the violation is established. Because Williams knew that the workers would enter the trench, they also had to have a competent person inspect the trench on the morning of the 19th. Substantial evidence supports that neither JP nor Zamba was a competent person within the meaning of the standard. To be a competent person, you must be capable of identifying hazardous working conditions and you must have authority to correct those hazards. OSHA has long interpreted the standard to mean that you have to know the OSHA standards in order to be a competent person. The evidence established that both JP and Zamba didn't know the OSHA standards. They were completely unfamiliar with them and didn't know the duties of a competent person. Without this knowledge, they could not qualify as competent persons, so whatever inspection they did on the morning of the 19th couldn't satisfy the standard. In addition, neither JP nor Zamba did anything to keep the employees out of the trench. This shows that they weren't capable of identifying and correcting hazards on the worksite. Rodney even admitted that they did not designate a competent person on this worksite. He testified that the competent person is whoever is paying attention. This evidence clearly establishes that no one on the worksite met the definition of competent person and the ALJ properly affirmed that citation. The same evidence that establishes that there was no competent person also establishes that Williams failed to instruct its employees in the hazards of excavations. The employer must instruct in the recognition and avoidance of hazards and the regulations applicable to the worksite. Because Williams's principal's employees did not know the regulations, they were incapable of instructing the employees in those regulations. What about Mr. Peterson's position that that has to be taken in a commonsensical way, that you don't stand up and tell a bunch of construction workers the details of the regulations, but rather what it is they need to know? That's completely incorrect. OSHA is very clear that common sense does not substitute for the specific instruction required under the standard. The standard is very clear that you have to instruct in the regulations. Common sense can't be a substitute. Meaning what? Do you stand up and read them the regulations, or why? No, OSHA doesn't restrict how you impart the information. So you don't need to stand up there and verbatim recite the regulations. You can create some type of training programs, and many employers do. It's not an infeasible requirement at all. And I forgot what I was going to say. No, the point here is that Williams's principals didn't know the regulations, and they made no effort to impart any information. And you can't put the onus on the employees to use common sense to keep themselves safe. The OSHA Act is very clear that the onus is on the employers to keep their employees safe. The evidence also establishes that Williams did not, in fact, instruct its employees, including its principals. JP and Zamba weren't trained, nor were Palomar and Goforth. Palomar had only worked on this site for about a week. Although he had worked for Williams for about nine months, his previous experience was in concrete and masonry. Therefore, Williams had to train him in trenching when he began work on the site. Williams failed to do that. Same with Goforth, who had worked there for about four days. Again, he testified that Williams did not provide training when he started work. The employees also testified that they didn't receive training on other days, including on the 19th. They weren't told to stay out of the unshored trench. What about the contention that the person who had to be trained was changed? Yeah, again, that's completely incorrect. The citation alleged that each employee in the trench was not trained. It wasn't specifically limited to Palomar and Peterson or Palomar and Aguinega. It was the employees who worked in the trench, and the evidence established that both Palomar and Goforth worked in the trench. Therefore, the employer was clearly put on notice that any employee who worked in the trench hadn't been trained. That was what the violation was about. That was what the evidence established at trial, and that's what controls. Although JP, Zamba, and Lopez testified generally that safety is discussed all the time, none of these individuals could remember specific instructions to stay out of the unshored trench on the 19th. In addition, Zamba and Lopez both testified that Palomar was an exemplary employee who never disobeyed instructions. All of this evidence supports the ALJ's finding that Williams failed to instruct its employees in excavation hazards. In sum, the vast weight of the evidence supports the ALJ's finding that Williams violated four construction and excavation standards. And if there are no further questions, thank you. Thank you very much. Just a couple of very brief comments. You can see the problem that the employer community has with OSHA. OSHA decides on the ways they're going to play things and how they're going to spin things. A competent person is defined in the regulations. It has nothing to do with OSHA training. It has nothing to do with any of that. The definition of a competent person is on page 10 of our opening brief in footnote 3. It's an individual who is capable of identifying hazards and has authority to take prompt corrective measures. That doesn't say anything like OSHA would like it to say. You see the problem. You fix it. That's a competent person by their own definition. Again, like I say, we had 55 years of experience out there. So for me to listen to the fact that we didn't have competent individuals out there running this project falls on kind of hollow, has kind of a hollow ring when you read the definition of a competent person. And I can tell you if we'd had a ladder where that ramp was, we wouldn't have been cited. There wouldn't have been any citation. They just want a ladder. He just didn't like the ramp. That's why he didn't address the judge didn't address it. When you look at the record, I think we've quoted that as well. Counsel for the Fed OSHA said the same thing. There was no ladder. It doesn't matter. That's one of the alternatives that's permitted. If that ladder had been in there, we wouldn't have been cited for that. It didn't matter. It mattered because the ramp was more than 40 feet from the other end, so you had to have something in the middle, and the logical thing was a ladder. I don't think, again, Your Honor, maybe that is a legal issue. I don't know. When you read the regulation, you have to have some means of access within 25 feet. Now, if the ramp's within 25 feet, the ramp's within 25 feet, and that's all you have to have, you don't get into these kind of technicalities when you're trying to perform construction activities. The ramp was there. Mr. Palomar had used it that very morning, apparently, according to his own testimony. That was within 25 feet, and frankly, it may have been a lot more than that because we don't know how far that ramp extended into the trench. We do know that they were a long ways away from the east end because, unlike counsel says, wherever that excavator was sitting, it's the bucket that reaches into the trench. It's not the body of the excavator. It's that extension bucket that reaches in there. No one's going to go near that bucket as he's digging more dirt and making the trench a little longer. But again, that's how it goes in these OSHA matters, that kind of thing. But anyway, I just wanted to make a couple of those comments. I thank you very much for your time. I appreciate it. Thank you very much.
judges: B. Fletcher, Berzon, Trager